Case 1:20-cv-00089   Document 47   Filed on 07/20/22 in TXSD   Page 1 of 9

United States District Court
Southern District of Texas
**ENTERED**
July 20, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ROSALBA YUMEN REYNA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 1:20-CV-089 |
| | § | |
| ANTONY J. BLINKEN, U.S. Secretary of State, | § | |
| | § | |
| Defendant. | § | |

## ORDER AND OPINION

"You're a U.S. citizen–and have been from the moment you were born–if you were born in the United States and subject to U.S. jurisdiction." *Garza v. Mayorkas*, ___ F.4th ___ (5th Cir. June 24, 2022).

Plaintiff Rosalba Yumen Reyna contends that she meets this criteria and enjoys United States citizenship because she was born in south Texas. Documentary evidence, however, casts doubt as to her birthplace. This lawsuit arose after the Department of State denied Plaintiff's passport application, based on a finding that she did not provide sufficient evidence to establish that she was born in the United States.

In May 2022, the Court held a bench trial to resolve the factual dispute. Based on the record and the applicable law, the Court concludes that Plaintiff has not demonstrated by a preponderance of the evidence that she was born in the United States. As a result, she does not satisfy the requirements to have acquired United States citizenship at birth.

**I.   Trial Record[1]**

Maria Teresa Alcantara was born in Villa Gonzalez, Tamaulipas, Mexico, in 1965. (Trans., 5)[2] Her family struggled financially, and when she was in her early twenties, she moved to

---

[1] At trial, the Court admitted 21 total exhibits and heard testimony from only one witness, Maria Teresa Alcantara—Plaintiff's mother.
[2] The bench trial proceedings have not been officially transcribed. For convenience, the Court includes citations to the draft transcript, which is consistent with the Court's recollection of the testimony.

1

Matamoros, Tamaulipas, Mexico, to work at "*maquiladoras*," or factories. (*Id.* at 8)  She had no family or close friends in Matamoros, and lived in a rented apartment with co-workers. (*Id.*)

While working at a *maquiladora*, she met Armando Reyna, Plaintiff's biological father. (*Id.* at 10)  Reyna expressed romantic interest in her, and they saw each other occasionally for about two or three months. (*Id.*)  Soon thereafter, around August 1991, Alcantara discovered that she was pregnant. (*Id.* at 11)  However, when she informed Reyna that she was expecting, he declined to take responsibility or provide financial support. (*Id.* at 12)  Her parents also refused to help her. (*Id.* at 13)  Despite having no support from Reyna or her family, Alcantara continued to reside and work in Matamoros throughout her pregnancy. (*Id.*)

### A. Alcantara's Account of Plaintiff's Birth

Alcantara testified that one day during her pregnancy, while she was standing outside the *Instituto Mexicano del Seguro Social* (IMSS), a government-owned hospital in Matamoros, she was approached by Rosalinda Esquivel. (*Id.* at 18)  Esquivel wore a nurse's uniform and informed Alcantara that she was a midwife who resided in San Benito, Texas, and who could deliver her baby in the United States. (*Id.* at 19)  Alcantara initially felt unsure about the proposal, but decided to consider the option after her roommate recommended Esquivel's services. (*Id.* at 20–22; Alcantara Aff., GX 5, Doc. 44, 9)  The roommate happened to be Esquivel's cousin. (Trans., 20–22)

When Alcantara went to IMSS for her next prenatal checkup, she also met with Esquivel to learn more about her midwife qualifications and the possibility of delivering her child in the United States. (*Id.* at 22)  She was around six months pregnant at the time. (*Id.* at 29)  After that meeting, Esquivel drove Alcantara to her clinic in San Benito, where she started a patient file and performed an initial evaluation. (*Id.* at 25–27)  Alcantara trusted Esquivel because she came across as a professional and had "all the medical equipment just like a doctor." (*Id.* at 34)

On several other occasions before Plaintiff's birth, Esquivel drove Alcantara from Matamoros to her San Benito clinic. (*Id.* at 29)  At each appointment, Alcantara paid in cash, but

2

she could not recall how much Esquivel charged for her services. (*Id.* at 27)  Although Alcantara had access to free healthcare at the government-owned hospital in Matamoros and was struggling financially, she testified that she paid for the midwife's services because she viewed giving birth in Texas as a way of "protecting" her child. (*Id.* at 28)

On the morning of April 9, 1992, Alcantara went into labor.  She called Esquivel, who advised her to get examined at IMSS. (*Id.* at 32)  Later that day, she again called Esquivel to tell her that she was "feeling strong pains," and Esquivel came to meet her outside the hospital. (*Id.*) Alcantara estimated that Esquivel picked her up around 12:30 p.m., and they drove to the midwife's clinic in San Benito. (*Id.* at 33)  After an initial examination, Esquivel instructed her to walk around because she was not yet ready to deliver. (*Id.* at 35)  Alcantara gave birth to Plaintiff around 4:00 p.m. (*Id.* at 31)  Alcantara and her newborn daughter, Rosalba Yumen Reyna, stayed overnight at Esquivel's clinic and returned to Matamoros the following morning. (*Id.* at 37)

### B. The Documentary Record

On April 13, Esquivel registered the birth of Rosalba Yunuen Reyna with the Texas Department of State Health Services, recording the birth as having taken place four days earlier in San Benito, Texas. (Tex. Birth. Cert., PX 1, Doc. 43, 1)  Alcantara recalls accompanying Esquivel because she wanted to get a print of the baby's foot, but she did not sign the birth certificate. (Trans., 38)  She instructed Esquivel to register Plaintiff with her biological father's last name because even though he did not intend to be involved in the child's life, she believed that having the father's last name would prevent her daughter from being bullied in school for being a child born out of wedlock. (*Id.* at 41)

Two and a half months later, on June 26, Alcantara registered Plaintiff's birth in Mexico, representing to the Mexican government that she gave birth to Rosalba Yunuen Reyna on April 8 in Matamoros.    (*Id.* at 42; Mex. Birth. Cert., GX 2, Doc. 44, 3)  Alcantara testified that she obtained this birth record so that her daughter could receive Mexican public services, such as day care and medical care.

3

In 1997, when Plaintiff was about five years old, Alcantara "was told they could not [enroll her in Kindergarten] with her Texas birth certificate, that she needed a Mexican certificate." (Alcantara Aff., GX 5, Doc. 44, 9)  Even though Alcantara had already obtained the 1992 Mexican birth record for Plaintiff, she recorded a second birth record in Mexico, this time registering her daughter as "Yunuen Euresti Alcantara," using the surname of her then-husband, Oscar Euresti Gonzalez, who appears on the document as Plaintiff's father.  (1997 Mex. Birth. Cert., PX 5B, Doc. 43, 9–10; Trans., 46)  As with the first Mexican birth record, this new registration recorded Plaintiff's birthplace as Matamoros, on April 8, 1992.  (1997 Mex. Birth. Cert., PX 5B, Doc. 43, 8)

### C. Esquivel's Fraudulent Conduct

After giving birth to Plaintiff, Alcantara maintained contact with Esquivel because she still owed her money and Esquivel's daughter provided milk for the baby.  (Trans., 50)  At some point, Esquivel told Alcantara "that she had some legal problems," but that these issues only affected "the newborns that were not born here in this country," so Alcantara had "nothing to worry about." (*Id.* at 51)

In 1995, Esquivel pled guilty to filing false birth certificates.  As part of her plea agreement, Esquivel signed an affidavit listing the names of individuals for whom she fraudulently procured a Texas birth certificate.  (Esquivel Aff., GX 3, Doc. 44, 4)  In that Affidavit, Esquivel confessed that she did not attend or assist in the birth of any of the individuals listed.  (*Id.* at 4–5; Trans., 59)  Plaintiff is the 157th name on this list.  (Esquivel Aff., GX 3, Doc. 44, 6)

Almost twenty years after Esquivel's conviction, Plaintiff applied for a United States passport.  The Department of State denied the application because "there is a statement by the birth attendant [i.e., Esquivel] who filed your [Texas] birth certificate that indicates the birth certificate was fraudulently filed".  (Dep't of State Letter, PX 7, Doc. 43, 15)  In addition, the Department of State noted the contemporaneous Mexican birth record that also raised doubts on Plaintiff's claim to have been born in the United States.  According to Alcantara, Plaintiff did not

4

know of the Mexican birth record until her failed attempt to obtain a United States passport. (Alcantara Aff., GX 5, Doc. 44, 9)

### II. Conclusions of Law

#### A. Applicable Standards

Plaintiff brings this declaratory judgment action under 8 U.S.C. § 1503(a), which provides a mechanism for an individual within the United States to challenge the denial of a right or privilege based on the determination of her citizenship. Under Section 1503(a), "[t]he Court must make a *de novo* determination of whether a plaintiff is a United States citizen." *Garcia v. Clinton*, 915 F. Supp. 2d 831, 833 (S.D. Tex. 2012), *aff'd sub nom. Garcia v. Kerry*, 557 F. App'x 304 (5th Cir. 2014).

"There are two sources of citizenship, and two only: birth and naturalization." *Bustamante-Barrera v. Gonzales*, 447 F.3d 388, 394 (5th Cir. 2006) (quoting *Miller v. Albright*, 523 U.S. 420, 423 (1998)). In the current matter, Plaintiff claims she acquired citizenship at the time of her birth by virtue of being born in the United States.

In a Section 1503(a) case, the district court holds a bench trial and weighs the evidence, determines the credibility of witnesses, and resolves conflicting testimony. FED. R. CIV. P. 52(a)(1), (6); *United States v. Jennings*, 726 F.2d 189, 190 (5th Cir. 1984). A plaintiff must prove, "by a preponderance of the evidence, that [s]he is an American citizen by birth." *Garcia*, 557 F. App'x at 308 (citing *De Vargas v. Brownell*, 251 F.2d 869, 871 (5th Cir. 1958)); *see also* 22 C.F.R. § 51.40 ("The applicant has the burden of proving that he or she is a U.S. citizen . . . ."). Proving a fact by a preponderance of the evidence means showing that the existence of that fact "is more likely than not." *Matter of Briscoe Enterprises, Ltd. II*, 994 F.2d 1160, 1164 (5th Cir. 1993). In essence, if the evidence demonstrates only that it is equally likely that the plaintiff was born in a foreign country as in the United States, the plaintiff has not carried his burden.

Section 1503(a) lawsuits typically involve specific types of documentary evidence for which certain legal principles apply. For example, a "contemporaneously filed foreign birth

record creates a presumption of alienage and is almost conclusive evidence of birth in that country." *Sanchez v. Kerry*, 4:11-CV-02084, 2014 WL 2932275, at *4 (S.D. Tex. June 27, 2014), *aff'd*, 648 F. App'x 386 (5th Cir. 2015). Courts weigh whether a filing is "contemporaneous" on a sliding scale, and have found that filing within three, eight and eleven days after birth satisfied the standard. *See Candela-Rios v. Lynch*, No. SA-16-MC-00220-JWP, 2017 WL 11046200, at *14 (W.D. Tex. Jan. 9, 2017), *aff'd sub nom. Candela-Rios v. Sessions*, 737 F. App'x 187 (5th Cir. 2018) (three days after birth); *Cobos*, 2015 WL 3965660, at *7 (eight days after birth); *Beltran v. Rivera*, No. 2:10-CV-24288-KMM, 2012 WL 2675477, at *3 (S.D. Fla. July 6, 2012) (eleven days after birth). A foreign birth certificate that contains accurate corroborating details, such as names and addresses, holds greater credibility. *See Sanchez*, 2014 WL 2932275, at *1.

In similar fashion, a Texas birth certificate "registered under this title that is certified by the state registrar is prima facie evidence of the facts stated in the record." TEX. HEALTH & SAFETY CODE ANN. § 191.052. But this evidence is rebuttable, "because prima facie evidence only refers to a minimum quantity, and constitutes enough evidence that raises either a presumption of fact, or that, which is sufficient, when unrebutted, to establish the fact." *See Sanchez*, 2014 WL 2932275, at *4 (quoting *Pinto-Vidal v. Att'y Gen. of U.S.*, 680 F. Supp. 861, 862 (S.D. Tex. 1987)). The Full Faith and Credit Clause of Article IV, Section 1 of the United States Constitution does not require federal courts to give preclusive effect to a determination by the Texas Department of Health and Human Services that an individual was born in Texas. *See Sanchez v. Clinton*, No. CIV.A. H-11-2084, 2012 WL 208565 (S.D. Tex. Jan. 24, 2012), *aff'd sub nom. Sanchez v. Kerry*, 648 F. App'x 386 (5th Cir. 2015).

Where the plaintiff's birth is registered in both the United States and a foreign country, "[c]ourts have found that a delayed birth certificate is either entitled to far less evidentiary weight than a contemporaneously filed birth certificate, or given no evidentiary weight." *Sanchez v. Kerry*, 2014 WL 2932275 (S.D. Tex. June 27, 2014) (cleaned up). Where both birth certificates were created contemporaneously, the latter record may still be afforded less weight. *See Candela-*

6

*Rios v. Lynch*, No. SA-16-MC-00220-JWP, 2017 WL 11046200 (W.D. Tex. Jan. 9, 2017), *aff'd sub nom. Candela-Rios v. Sessions*, 737 F. App'x 187 (5th Cir. 2018) ("Although petitioner submitted evidence of a Texas birth certificate, it post-dated his Mexican birth certificate, was not signed by either parent, and was recorded twelve days after petitioner's reported birth in Texas; it is, therefore, afforded less weight than petitioner's Mexican birth record.").

Baptismal certificates, medical records, and school records constitute evidence of an individual's birthplace, but courts consider such documents as "secondary evidence". *See, e.g., De La Cruz v. Clinton,* No. A-11-CV-675-AWA, 2012 WL 1941373, at *2 (W.D. Tex. May 29, 2012).

As for testimony, courts weigh the credibility of witnesses, but receive a plaintiff's self-serving statements and those of interested witnesses "with a grain of salt." *De Vargas*, 251 F.2d at 872; *see also Garcia*, 915 F. Supp. 2d at 835; *Patel v. Rice*, 403 F. Supp. 2d 560, 565 (N.D. Tex. 2005), *aff'd*, 224 F. App'x 414 (5th Cir. 2007).

Courts must "resolve all doubts 'in favor of the United States and against' those seeking citizenship." *Gonzalez-Segura v. Sessions*, 882 F.3d 127, 131 (5th Cir. 2018) (quoting *Berenyi v. Dist. Dir., INS.*, 385 U.S. 630, 637 (1967).[3]

**B. Application**

Applying the applicable standard and legal principles to the evidence admitted at trial, the Court concludes that Rosalba Yunuen Reyna has not established by a preponderance of the evidence that she was born in the United States.

The Court addresses first the documentary evidence. The Government places great weight on the two Mexican birth records, each of which identifies Matamoros as the Mexican city in which Alcantara gave birth to Plaintiff. In contrast, in support of her position, Plaintiff highlights the

---

[3] The parties contest whether the Court must resolve all doubts in favor of the United States and against those seeking citizenship. (JPO, Doc. 29, 4, 8) Plaintiff argues that the principle applies only when an individual seeks citizenship through naturalization, and not in cases where an individual seeks recognition of citizenship through birth in the United States. (*Id.* at 4) The Court concludes that the law does not support Plaintiff's proposed limitation, and agrees with other courts which have applied the principle in cases involving alleged citizenship by birth in the United States. *See, e.g., Cobos v. Kerry*, No. CIV.A. H-13-02897, 2015 WL 3965660, at *7 (S.D. Tex. June 30, 2015). In any event, even if the principle did not apply to the current matter, the Court would reach the same conclusions as contained in this Order and Opinion.

Texas birth certificate, which Esquivel filed within days of Plaintiff's birth. While the Texas birth certificate represents a contemporaneously-filed birth record, this fact only establishes prima facie evidence of the statements indicated in that document. Those statements are rebuttable. And the Mexican birth records, coupled with Esquivel's sworn confession that she fraudulently filed Plaintiff's Texas birth certificate, present strong rebuttal evidence. Taken as a whole, the documentary evidence weighs slightly in favor of the United States' position in this lawsuit—i.e., that Alcantara did not give birth to Plaintiff in the United States.[4]

As for testimony, the Court heard only one witness, Plaintiff's mother, who undoubtedly represents an interested witness whose testimony must be taken "with a grain of salt." Based on the overall trial record, the Court does not find Alcantara's testimony credible and does not accept her version of where she gave birth to Plaintiff. Most importantly, Alcantara's behavior on several occasions demonstrates her willingness to make false representations to government officials when she believed it advantageous to her interests. Based on Alcantara's version of the facts, she intentionally registered two fraudulent birth records in Mexico for Plaintiff. The second birth record changed Plaintiff's surname and falsely identified Euresti as her father. Alcantara testified about her motivations for filing these birth records, claiming that she did so to ensure that Plaintiff received educational and medical benefits. She also claimed that she changed Plaintiff's name on the second record to protect her daughter from bullying. Her testimony confirms her willingness to misrepresent facts to government officials, even if for altruistic purposes. She now contends that the Texas birth certificate contains truthful details regarding Plaintiff's birth. But she acknowledged that she considered it beneficial for Plaintiff to enjoy United States citizenship. As a result, in the same way that she conceded that she misrepresented facts to Mexican authorities

---

[4] The Court places some, but not great weight on Esquivel's affidavit. The record contains few facts surrounding the creation of the affidavit, and it appears that Esquivel is deceased, precluded her from testifying in this lawsuit. (See Plaintiff's Objections, Doc. 36) No party in this lawsuit had the opportunity to question Esquivel regarding her ability to remember the specific individuals whose birth she attended in south Texas, and those individuals for whom she filed a fraudulent birth certificate. As she signed the affidavit in connection with a criminal prosecution, she may have believed that maximizing the number of individuals on the list would prove to her benefit.

to benefit her daughter, she could just as easily have made false representations to Texas officials to ensure that Plaintiff obtained United States citizenship. In essence, Alcantara's own testimony reveals her willingness to make false statements to government agencies, and no evidence enables the Court to accept her testimony and statements to Texas officials over her statements on two occasions to Mexican authorities.

Also, certain details in Alcantara's testimony strike the Court as implausible. In particular, her testimony rendered clear that she experienced significant financial difficulties before and during her pregnancy, supporting herself without help from her family or Plaintiff's father. Despite these strained financial circumstances, she testified that she paid Esquivel in cash for her services, even though she could have received free medical care at IMSS, the Mexican health institute. Alcantara did not recall how much she paid Esquivel, but any amount would have represented a significant burden. Given that Esquivel offered to file fraudulent Texas birth certificates for women who gave birth to children in Mexico, it is equally plausible that Alcantara took advantage of the free medical services in Mexico, and then paid Esquivel solely to file a fraudulent birth certificate.

Viewing the trial record as a whole, the Court concludes that the evidence slightly supports the conclusion that Alcantara gave birth to Plaintiff in Matamoros. Some evidence supports both versions of the facts. But to prevail, Plaintiff had to convince the Court that the preponderance of the evidence indicated a birth in south Texas. She failed to meet this burden.

### III. Conclusion

Based on the Court's findings of fact and the applicable law, it is:

**ORDERED** that Plaintiff Rosalba Yumen Reyna's request for a declaratory judgment under 8 U.S.C. § 1503(a) is **DENIED**.

Signed on July 20, 2022.

Fernando Rodriguez, Jr.
United States District Judge